1

2

3

4                    UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   AAT BIOQUEST, INC.,                    Case No.  14-cv-03909-DMR

         Plaintiff,
8
                                           FINDINGS OF FACT AND
9        v.                                CONCLUSIONS OF LAW

10  TEXAS FLUORESCENCE
    LABORATORIES, INC.,
11
         Defendant.

12

13       This is a patent infringement action.  The court determined on summary judgment that

14  Defendant Texas Fluorescence Laboratories ("TEFLABS") had infringed United States Patent No.

15  8,779,165, to which Plaintiff AAT Bioquest ("AAT") holds all rights, title, and interest.  *See*

16  Docket No. 46 ("MSJ Order").  In reaching this determination, the court rejected TEFLABS's

17  arguments that the patent was invalid and/or unenforceable due to inequitable conduct.

18       The remaining issues relate to AAT's claims for damages, interest, costs, and attorneys'

19  fees.[1]  The court held a bench trial on damages and entitlement to attorneys' fees.  Pursuant to

20  Federal Rule of Civil Procedure 52(a), the court makes the following findings of fact and

21  conclusions of law.

22                  I.        FINDINGS OF FACT

23       A.    Background

24  1.  AAT and TEFLABS are direct competitors in the business of making, marketing, and

25

26  ─────────────────────────

27  [1]   In addition to compensatory damages, the prevailing party in a patent infringement suit is
    entitled to recover "interest and costs as fixed by the court."  35 U.S.C. § 284.  The parties agreed
    to brief the issues of what interest rate to apply and how often it should be compounded, and the
28  amount of awardable costs in post-trial submissions.

United States District Court
Northern District of California

United States District Court
Northern District of California

selling fluorescent ion indicators.[2]  They have competed in this market since at least January 2011.

2.   Dr. Zhenjun Diwu is the President of AAT.  Dr. Diwu has worked in the research and development of calcium ion indicators for over 20 years.  He is a named inventor on 47 issued patents and a number of pending patent applications.  AAT has 19 employees.  In 2014, AAT's revenue was between $4 and $5 million.

3.   Dr. Akwasi Minta is the founder, chairman, and chief scientist of TEFLABS.  Dr. Minta has 40 years of experience in the field of fluorescent ion indicators.  TEFLABS has two directors—Dr. Minta and Mr. Rick Yeager, whose role is discussed further below—and three other employees.  Dr. Minta and Mr. Yeager are responsible for managing and making decisions on behalf of TEFLABS.  TEFLABS's revenue in 2014 was about $400,000.  Roger Tsien and Dr. Minta were the named inventors in United States Patent No. 5,049,673 (the "Tsien Patent"), which issued in 1991 and is also in the field of fluorescent calcium ion indicators.

4.   At trial, both parties called the same witnesses: Dr. Diwu, Dr. Minta, and Mr. Yeager.

**B.     The '165 Patent and AAT's Fluo-8 Product**

5.   On July 15, 2014, the United States Patent and Trademark Office ("USPTO") issued Patent No. 8,779,165 ("the '165 Patent"), entitled "Fluorescent Ion Indicators and Their Applications."  AAT holds all rights, title, and interest in the '165 Patent.  AAT manufactures a product called Fluo-8 AM MA ("Fluo-8"), which is an embodiment of the invention claimed in Claim 1 of the '165 Patent.

6.   Fluo-8 is a desirable product among fluo indicators.  It has improved loading and brightness as compared to Fluo-4, another popular product.  Fluo-8 also has less temperature sensitivity, which means that tests can be performed easily at room temperature.  Ample evidence supports that TEFLABS recognized and advertised Fluo-8's advantageous qualities to its customers.  TEFLABS asked Dr. Joseph Kao to analyze Fluo-8 and compare it with Fluo-3 and Fluo-4.  Dr. Kao acknowledged that Fluo-8 is a better, higher intensity indicator than those two

---

[2]   The specifics of the technology are discussed in the court's order on summary judgment.  For simplicity, the court refers to the relevant class of products as "fluo indicators" or "calcium indicators."

products.  TEFLABS's own marketing materials and customer communications tout Fluo-8's superiority.  *See, e.g.,* Joint Statement of Undisputed Facts ("JSUF") 20 ("TEFLABS advertised Fluo-8 "'the brightest and easiest loading Fluo indicator, and its long wavelength, high sensitivity, affinity, and fluorescent enhancement (.100x) make Fluo-8 an ideal indicator for the measurement of cellular calcium.'"); TEFLABS products list (Ex. 3) (Fluo-8 is "the brightest Fluo Dye available!"); marketing letter from Dr. Minta (Ex. 7) ("Fluo-8 is enjoying popularity over Fluo-4 owing to its better brightness and easier loading"); article on TEFLABS's website (Ex. 18) ("Fluo-2 MA (the same molecule as Fluo-8) has become a very cost effective replacement for screeners and researchers currently using Fluo-3, Fluo-4 or Fluo-8.").

7.   AAT is not aware of any Fluo-8 customer that has switched back to another fluo indicator after using Fluo-8.  There are no acceptable non-infringing substitutes to Fluo-8, (that is, no unpatented product with the same properties as Fluo-8), because only Fluo-8 has its improved qualities of loading, brightness, and less temperature sensitivity.

8.   Fluo-8 has been commercially successful for AAT, becoming its best-selling product within six months of its first commercial release in 2007.  Similarly, TEFLABS's Fluo-8 product became its best-selling calcium indicator until it ceased selling the product in May 2015 as a result of this lawsuit.

9.   Beginning on July 15, 2014, the issuance date for the '165 Patent, AAT put the patent number on its online product information sheet for Fluo-8 and also on the printed product materials.  Even before the patent issued, TEFLABS understood that AAT marked its Fluo-8 product as patent pending.

### C.   TEFLABS's Manufacture and Sale of Fluo-8

10. TEFLABS concedes that it made and sold a product with the same structure as Fluo-8, which TEFLABS initially called Fluo-2 MA AM.  TEFLABS eventually re-named its product Fluo-8 MA, because customers were asking for Fluo-8.[3]  It is undisputed that AAT and TEFLABS

---

[3]  To simplify the terminology, the court refers to the compound of Claim 1 of the '165 Patent (which AAT calls "Fluo-8 AM MA" and TEFLABS calls "Fluo-2 MA AM" and "Fluo-8 MA") as "Fluo-8."

are the only manufacturers of Fluo-8.

11. There is also no dispute that TEFLABS intentionally copied Fluo-8 and began to manufacture and sell it.  During the relevant time period, AAT maintained the confidentiality of Fluo-8's molecular structure.  In order to manufacture the product, TEFLABS instructed Dr. Kao (an individual not associated with AAT) to obtain a sample of Fluo-8, because TEFLABS did not think AAT would sell to TEFLABS directly.  Once TEFLABS obtained the structure, it began making the product.

12. In 2011, AAT asked TEFLABS how it had determined the structure of Fluo-8, including how TEFLABS obtained a source for Fluo-8. TEFLABS refused to provide that information.

13. TEFLABS informed its customers that what it called "Fluo-2 MA AM" was the same product as AAT's Fluo-8.  For example, TEFLABS knew that Scripps Florida was an AAT customer.  TEFLABS told Scripps Florida that its Fluo-2 MA AM was the same as Fluo-8, and sent Scripps Florida a sample to confirm that fact.  TEFLABS then lowered its price of Fluo-8 below AAT's price so that TEFLABS could get Scripps Florida as a customer.

### D.    TEFLABS's Awareness of '165 Patent

14. TEFLABS first became aware of the patent application that later resulted in the '165 Patent in 2009 or 2010.

15. On January 18, 2011, AAT sent TEFLABS a notice letter that included a copy of the patent application.  The letter indicated that the then-pending application was relevant to TEFLABS's Fluo-2 MA AM product.  TEFLABS did not consider ceasing its manufacture or sale of Fluo-8 after receiving the letter.

16. TEFLABS also chose not to obtain an independent opinion of counsel. Instead, it relied on the opinion of Mr. Yeager, who is the President of TEFLABS and is also a patent attorney.  He has been licensed by the USPTO for twenty years, and his practice involves the preparation and analysis of patents, particularly patents that relate to TEFLABS's core business.

17. Mr. Yeager is TEFLABS's counsel of record in this case, and he has not received compensation for his work.  TEFLABS did not hire counsel to defend this action because it believed the legal issues in this lawsuit, and in the pre-litigation review of the patent and patent

United States District Court
Northern District of California

4

United States District Court
Northern District of California

application, were straightforward enough that TEFLABS did not need outside counsel.  In any event, TEFLABS did not have the ability to pay outside counsel.

18. On March 3, 2011, Mr. Yeager responded to the January 18, 2011 letter on behalf of TEFLABS.  TEFLABS knew when it copied Fluo-8 that the product would be covered by AAT's patent if it issued.  However, TEFLABS was convinced that the USPTO would not issue a patent.  As it asserted in its March 3, 2011 response to AAT, TEFLABS believed that Fluo-8 was in the public domain because it was covered by the claims in the Tsien patent, which had expired.  Dr. Minta believed that the structure of the Fluo-8 compound was the same as the Fluo-2 compound that he had co-invented in the Tsien Patent.  However, Dr. Minta conceded that he had never made a compound with the specific structure of Fluo-8 until TEFLABS copied Fluo-8.

19. The March 3, 2011 letter is the only written document reflecting Mr. Yeager's (and thus TEFLABS's) assessment of the validity of Claim 1 of the '165 Patent.  Thus, before this lawsuit, TEFLABS's only basis for believing that AAT's patent application should not issue was based on the defenses of obviousness and anticipation in light of the Tsien Patent.  As discussed below, in issuing the '165 patent, the patent examiner considered but rejected arguments about the Tsien patent during the course of patent prosecution.

20. TEFLABS did not monitor the prosecution of AAT's patent application.  After the '165 Patent issued on July 15, 2014, AAT sent TEFLABS an August 28, 2014 cease and desist letter, enclosing the '165 Patent and demanding that TEFLABS stop its infringement.  AAT also informed TEFLABS that if it ceased its infringing activities immediately, AAT would not pursue litigation or seek damages.

21. At this point, TEFLABS understood that its accused Fluo-8 product was covered by a claim of the issued '165 Patent.  Nonetheless, TEFLABS did not cease its manufacture and sale of its Fluo-8 product, nor did it attempt to design around the invention claimed in the patent.  Once again, TEFLABS opted not to obtain an independent opinion of counsel as to the validity of Claim 1 of '165 Patent claim after the patent issued.

22. Among the reasons TEFLABS did not stop making and selling its Fluo-8 product was because it represented $60,000 in annual sales.  TEFLABS also hoped to win over AAT's

customer, Molecular Devices, and grow those sales to $500,000 per year.  In addition, TEFLABS was exploring the possibility of being acquired by Molecular Devices.  TEFLABS approached Molecular Devices in 2013 about acquiring TEFLABS and becoming the exclusive marketer for TEFLABS's calcium products.

### E.    AAT and TEFLABS's Sales of Fluo-8

23. The parties agree that the chart below accurately summarizes AAT and TEFLABS's annual revenues from Fluo-8 (*see* JSUF Ex. A):

| Year | AAT Sales ($) | TEFLABS Sales ($) |
|------|---------------|-------------------|
| 2007 | 72,002 | 0 |
| 2008 | 178,101 | 0 |
| 2009 | 428,366 | 0 |
| 2010 | 507,041 | 2,600.50 |
| 2011 | 510,722 | 36,513.00 |
| 2012 | 377,414 | 81,587.14 |
| 2013 | 396,726 | 58,354.57 |
| 2014 | 519,801 | 68,191.75 |

24. The parties also agree that the chart below accurately summarizes the per-customer revenue TEFLABS made from its infringing sales of Fluo-8 between July 15, 2014 (the date the '165 Patent issued) and May 27, 2015 (the date of TEFLABS's last infringing sale)(*see* JSUF Ex. B):

| Customer | Amount Sold | Total Revenue to TEFLABS |
|----------|-------------|--------------------------|
| Med Chem 101 | 865.0 mg | $36,825 |
| VRW International GmBH | 100.0 mg | $6,930 |
| Takeda Cambridge Ltd. | 50.0 mg | $12,000 |

| | | |
|---|---|---|
| Abcam PLC | 73.0 mg | $4,389 |
| Cambridge Bioscience Ltd. | 29.8 mg | $2,026.50 |
| All other customers | 112.5 mg | $14,277.00 |
| **TOTAL** | **1230.3** | **$76,447.50** |

25. It is undisputed that AAT's costs, including materials, labor, and general and administrative costs are $2.90 per milligram of Fluo-8. AAT's 2014/2015 list price for Fluo-8 was $245 per milligram. However, AAT offers discounts for strategically advantageous customers: a 40% discount for distributors, or $147 per milligram; and a 60% discount for potential strategic partners, or $98 per milligram. Dr. Diwu testified that Med Chem 101 and VRW were potential strategic partners that would have been charged the $98 rate; Takeda, Abcam, and Cambridge Bioscience would have been charged the $147 rate for distributors; and the remaining small-volume customers would have been charged the $245 list price, for a total of $144,594.10 in revenue. Applying these rates and subtracting AAT's cost of $2.90 per milligram yields lost profits of $141,026.23 for the sales of Fluo-8 made by TEFLABS.

26. Dr. Diwu testified that AAT has also suffered harm to reputation, price erosion, and lost opportunities to do business with other potential customers as a result of TEFLABS's sales. For example, Dr. Diwu testified that two customers asked AAT to match the lower price being offered by TEFLABS for Fluo-8, in one case resulting in AAT reducing its price from $147 to $73 per milligram. According to Dr. Diwu, AAT decided not to seek damages for these other harms because it did not have funds to hire an expensive damages expert.

27. The parties agree that AAT has the manufacturing and marketing capability to have made the Fluo-8 sold by TEFLABS, and has the capacity to meet the Fluo-8 demand going forward.

**F.     Procedural History and TEFLABs's Failures to Comply with the Injunction**

28. TEFLABS acknowledged that if the '165 Patent is valid, then its Fluo-8 product infringed AAT's patent. TEFLABS therefore proposed, and the parties agreed, that this case should proceed on an expedited schedule with early motions for summary judgment on the issue of patent validity.

29. On April 13, 2015, this court denied summary judgment on all of TEFLABS's invalidity

United States District Court
Northern District of California

and inequitable conduct defenses, and granted AAT's cross-motion for summary judgment of no invalidity and no inequitable conduct. *See generally* MSJ Order. TEFLABS's invalidity defense relied primarily on prior art (the Tsien Patent) that TEFLABS knew had been considered by the examiner in prosecution, and had been overcome. In the order on summary judgment, the court noted at numerous points TEFLABS's basic failures to present evidence or case law relevant to the legal issues. *See, e.g.*, MSJ Order at 8, 12, 20. For example, Mr. Yeager acknowledged at trial that he did not cite any case law in TEFLABS's motion for summary judgment relevant to whether a species is patentable over a genus claim. The court discusses below in greater detail additional evidence from the summary judgment record.

30. On May 1, 2015, the court entered a permanent injunction. Docket No. 50. The court ordered TEFLABS "permanently restrained…from manufacturing, using, selling, importing, and/or offering for sale fluo indicators which have the same structure as the indicator claimed in Claim 1 of the '165 Patent in the United States for the life of the '165 Patent." *Id.* at 2. However, TEFLABS took no action to comply with the permanent injunction until approximately two weeks later. Specifically, Mr. Yeager claims that he told Dr. Minta about the injunction on or before May 1, 2015. However, Dr. Minta testified that Mr. Yeager did not notify him about the injunction until two weeks later, at which point Dr. Minta instructed TEFLABS employees to stop selling Fluo-8. Mr. Yeager took no action to implement the injunction other than to notify Dr. Minta of its existence.

31. Between May 1 and May 14, 2015 TEFLABS made ten sales of Fluo-8 in violation of the court's permanent injunction.

32. TEFLABS agreed to provide a certification of compliance with the permanent injunction by May 13, 2015 but missed this deadline by one day. On May 14, 2015, TEFLABS served a certification by Dr. Minta which said, "This is to certify that TEFLABS has stopped selling Fluo-2 MA AM. We currently have 50 mg in stock and 500mg impure and all will be destroyed as requested." On May 19, 2015, Mr. Yeager represented to AAT's counsel that TEFLABS had stopped selling Fluo-8.

United States District Court
Northern District of California

33. Notwithstanding Dr. Minta's certification and Mr. Yeager's representation to counsel, TEFLABS made two more sales of Fluo-8 after May 14, 2015.  According to TEFLABS, this occurred despite Dr. Minta's instructions because a new employee had begun working for TEFLABS, and Dr. Minta did not inform her that she should stop selling the infringing product. Altogether, TEFLABS made twelve sales of Fluo-8 after the court entered the preliminary injunction, for total revenue of $2,015.

34. At trial, Dr. Minta testified that TEFLABS's Fluo-8 inventory had been destroyed.  Mr. Yeager could not confirm this, because he had not taken any steps to verify the fact of destruction.

### G.    TEFLABS's Conduct During Litigation

35. TEFLABS notes several undisputed facts that demonstrate its good faith conduct during litigation.  TEFLABS stipulated that if the '165 Patent was valid, then its Fluo-8 product infringed the patent, thereby obviating litigation of that fact.  TEFLABS also stipulated to numerous facts in the JSUF to facilitate a shorter trial on damages.

36. However, TEFLABS's overall litigation conduct was far from ideal.  For example, Mr. Yeager testified during his deposition that TEFLABS had put a litigation hold in place to prevent the destruction of documents relevant to the case.  But in fact, TEFLABS did not issue a litigation hold or inform its employees not to destroy materials that might be relevant to this case.  Dr. Minta testified that he never informed TEFLABS employees not to destroy potentially relevant documents because Mr. Yeager never instructed him to do so.  Mr. Yeager contradicted this, testifying that he did tell Dr. Minta to implement a litigation hold.  At any rate, there is no record evidence that documents were lost or destroyed as a result of TEFLABS's failure to implement a litigation hold.

37. TEFLABS's conduct in responding to written discovery, though dilatory, did not harm AAT.  TEFLABS served responses to Requests for Production on February 4, 2015, indicating that no documents existed for most of the document requests, but did so before it had searched any electronic email files.  TEFLABS produced fewer than 20 documents before the February 23, 2015 close of fact discovery.  These documents were the ones that Mr. Yeager could easily access by looking through the company's DropBox account.  TEFLABS unilaterally decided not

9

to produce all of its documents in time to meet the February 23, 2015 fact discovery cutoff because it wanted to save the expense of document production until after the summary judgment hearing.  On February 26, 2015, the parties filed a joint stipulation in which AAT agreed to extend the discovery deadline to March 11, 2015 for certain of TEFLABS's responses, including its production of documents.  TEFLABS produced the remainder of its documents on March 11, 2015, after briefing on the cross-motions for summary judgment was complete.  There is no evidence in the record that AAT was prejudiced by TEFLABS's discovery conduct.

38. TEFLABS also alleged an on-sale bar defense in its Answer, but made no investigation into the facts of the defense before filing its answer.  TEFLABS abandoned this defense prior to summary judgment.  There is no record evidence that the parties expended resources litigating the on-sale bar defense prior to its abandonment.

39. TEFLABS took unrealistic and antagonistic settlement positions.  Early in the case, Mr. Yeager offered a potential settlement in which AAT would buy TEFLABS, but the offer was not well-received.  On December 14, 2014, TEFLABS made a settlement offer to AAT under which AAT would pay TEFLABS a sum of money, and TEFLABS would receive a fully paid-up license to the '165 patent and related patents, in exchange for TEFLABS not challenging AAT's patents or expanding TEFLABS's infringement.  In the settlement offer, TEFLABS opined that AAT could owe TEFLABS $500,000 if AAT lost, and the case was found to be exceptional, based on TEFLABS's anticipated demand for attorneys' fees and relinquishment of AAT's profits from the sale of Fluo-8 (although TEFLABS admitted it did not have a claim against AAT that would have provided a basis for the latter).  TEFLABS never made a settlement offer in which it proposed to pay AAT for its infringing sales of Fluo-8.

## II.      ISSUES AT TRIAL

The court held a bench trial on the following issues:

(1) Whether AAT is entitled to lost profits or reasonable royalties for TEFLABS's infringement of the '165 Patent;

(2) Whether TEFLABS willfully infringed the '165 Patent, and if so, whether damages should be enhanced; and

(3) Whether this is an exceptional case pursuant to 35 U.S.C. § 285, and if so, whether AAT is entitled to an award of attorneys' fees.

## III.    CONCLUSIONS OF LAW

### A.    Damages Under 35 U.S.C. § 284

#### 1.    Legal Standards

Upon a finding of infringement, the patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. "The burden of proving damages falls on the patentee." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). "There are two methods by which damages may be calculated under [35 U.S.C. § 284]. If the record permits the determination of actual damages, namely, the profits the patentee lost from the infringement, that determination accurately measures the patentee's loss. If actual damages cannot be ascertained, then a reasonable royalty must be determined." *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983). *See also Lucent*, 580 F.3d at 1324 ("Two alternative categories of infringement compensation are the patentee's lost profits and the reasonable royalty he would have received through arms-length bargaining."). "The correct measure of damages is a highly case specific and fact-specific analysis." *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1366 (Fed. Cir. 2008).

"Lost profits damages are appropriate whenever there is a reasonable probability that 'but for' the infringement, the patentee would have made the sales that were made by the infringer." *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1263-64 (Fed. Cir. 2013) *cert. denied*, 134 S. Ct. 1013 (2014) (citation and formatting omitted). "The 'but for' inquiry therefore requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee" would have made. *Grain Processing Corp. v. Am. Maize–Products Co.*, 185 F.3d 1341, 1350 (Fed. Cir. 1999). "To prevent the hypothetical from lapsing into pure speculation, [the] court requires sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture." *Id.*

The Federal Circuit has stated that a useful, but non-exclusive way for a patentee to prove entitlement to lost profits is the *Panduit* four-factor test.  *See Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)); *Versata*, 717 F.3d at 1264 ("A showing under the four-factor *Panduit* test establishes the required causation.").  These factors are: "(1) demand for the patented product, (2) absence of acceptable noninfringing alternatives, (3) manufacturing and marketing capability to exploit the demand, and (4) the amount of profit [the patentee] would have made." *Panduit*, 575 F.2d at 1156.  "A patentee need not negate every possibility that the purchaser might not have purchased a product other than its own, absent the infringement." *Rite-Hite*, 56 F.3d at 1545.  "The patentee need only show that there was a reasonable probability that the sales would have been made 'but for' the infringement.  When the patentee establishes the reasonableness of this inference, e.g., by satisfying the *Panduit* test, it has sustained the burden of proving entitlement to lost profits due to the infringing sales." *Id.*  "The burden then shifts to the infringer to show that the inference is unreasonable for some or all of the lost sales." *Id.*

An alternative to the *Panduit* test for determining entitlement to lost profits damages is the two-supplier market test.  *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed. Cir. 2003).  The two-supplier market test requires the patentee to show: (1) the relevant market contains only two suppliers; (2) the patentee has the marketing and manufacturing capacity to make the sales that were lost to the infringer; and (3) the amount of profit that the patentee would have made. *Id.*  "In essence, the two-supplier market test collapses the first two *Panduit* factors into one 'two suppliers in the relevant market' factor." *Id.  See also GuideTech, Inc. v. Brilliant Instruments, Inc.*, No. C 09-5517 CW, 2014 WL 4182340, at *5 (N.D. Cal. Aug. 22, 2014).  That is, "[a]ccurately identifying a two-supplier market requires an analysis which excludes alternatives to the patented product with disparately different prices or significantly different characteristics." *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1288 (Fed. Cir. 2011) (citation and formatting omitted).[4]

---

[4]  Since the two-supplier market test essentially collapses the first two *Panduit* factors, the court declines to analyze the facts under both standards and opts for the *Panduit* test, with the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    If lost profits cannot be ascertained, then the patentholder is entitled to damages in the

2    form of a reasonable royalty on the infringer's sales.  *Hanson*, 718 F.2d at 1078.

3        **2.    Analysis**

4    AAT seeks lost profit damages for TEFLABS's sales of Fluo-8, starting from the date of

5    the issuance of the '165 Patent until TEFLABS's last infringing sale in May 2015.  In the

6    alternative, AAT seeks a reasonable royalty for those sales.

7    The court finds that AAT is entitled to damages beginning from July 15, 2014, the date the

8    '165 Patent issued, because it is undisputed that AAT publicly marked the materials for Fluo-8

9    with the patent number in compliance with the marking statute.  *Maxwell v. J. Baker, Inc.,* 86 F.3d

10   1098, 1111 (Fed Cir. 1996).

11    The court also finds that AAT is entitled to lost profit damages.  AAT meets much of its

12   burden of establishing the *Panduit* factors through undisputed facts to which the parties have

13   stipulated.

14   The first *Panduit* factor is the demand for the patented product.  TEFLABS concedes this

15   factor.  *See* Def.'s Proposed Findings of Fact and Conclusions of Law ["Def.'s PFFCL," Docket

16   No. 86] at 25 ("Plaintiff has demonstrated a demand for the patented product").  In any event,

17   ample evidence supports the existence of demand for Fluo-8.  It is undisputed that TEFLABS's

18   Fluo-8 product is the same compound as AAT's Fluo-8 product; thus, the demand for Fluo-8 is

19   illustrated by TEFLABS's undisputed Fluo-8 sales in 2014 and 2015.  *See BIC Leisure Products,*

20   *Inc. v. Windsurfing Int'l, Inc*., 1 F.3d 1214, 1218-19 (Fed. Cir. 1993) ("Evidence of [the

21   infringer's] sales of the infringing product may suffice to show *Panduit*'s first factor," as long as

22   "the patent owner and the infringer sell substantially the same product.").  Product demand is

23   further bolstered by the fact that Fluo-8 was TEFLABS's best-selling product during that time

24   period.

25   AAT has also met its burden of proof on the second *Panduit* factor, which is the absence of

26

27   understanding that the same facts would lead to the same conclusion under the two-supplier

28   market test.

United States District Court
Northern District of California

1    acceptable noninfringing alternatives.  The parties have stipulated that the relevant market for

2    Fluo-8 is a two-supplier market consisting of AAT and TEFLABS.  Dr. Diwu testified that there

3    are no acceptable noninfringing alternatives to Fluo-8.  *Accord GuideTech*, 2014 WL 4182340 at

4    *5 (CEO testified that "in his years of experience in the field, he observed that were only two

5    competitors in the market of high-frequency time interval analyzers. . . .This is evidence that there

6    were no acceptable non-infringing substitutes and that the market consisted of only two

7    suppliers.").  Moreover, ample evidence, including TEFLABS's own marketing materials and

8    customer communications, demonstrates that Fluo-8 has unique and desirable qualities that

9    distinguish it from other fluo indicators.

10          TEFLABS's argument that noninfringing substitutes were available for Fluo-8 is

11   unpersuasive.  It rests on two premises: (1) that the small market share of Fluo-8 in the fluo

12   indicator market as compared with Fluo-3[5] and Fluo-4 establishes that those products are

13   acceptable noninfringing substitutes; and (2) the "fact that Dr. Tsien's affidavits[6] tout the

14   advantages of both 'Fluo-2' and 'Fluo-8' over Fluo-3 strongly suggests that Fluo-2 is a

15   noninfringing alternative to Fluo-8."  Def.'s PFFCL at 25.  Neither of these premises is true.

16          With respect to TEFLABS's first premise, the size of Fluo-8's share in the total market for

17   fluo indicators is not relevant, since there is no evidence that Fluo-3 and Fluo-4 have the same

18   desirable features as Fluo-8 such that they could be considered noninfringing alternatives.  *See*

19   *Apple Inc. v. Samsung Electronics Co.*, 786 F.3d 983, 1004 (Fed. Cir. 2015) ("The mere existence

20   of a competing [product] does not make that [product] an acceptable substitute.") (citation and

21   formatting omitted); *Standard Havens Products, Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1373

22   (Fed. Cir. 1991) ("[I]f purchasers are motivated to purchase because of particular features

23   available only from the patented product, products without such features—even if otherwise

---

5    There is no evidence in the record about the market share of Fluo-3.  Moreover, Fluo-4 is a
patented product.

6    This portion of TEFLABS's argument apparently refers to Dr. Diwu's affidavits submitted to
the USPTO during prosecution of the '165 Patent.  *See* Exs. F7, F8.

competing in the marketplace—would not be acceptable noninfringing substitutes.").  Indeed, TEFLABS's own marketing materials clearly tout the superiority of Fluo-8 over Fluo-3 and Fluo-4 in a number of key aspects, such as loading, brightness, and cost effectiveness.

With respect to TEFLABS's second premise, TEFLABS relies exclusively on incomprehensible attorney argument rather than record evidence.  TEFLABS claims that the affidavits show that "Dr. Diwu [told the USPTO that] both Fluo-8 AM and Fluo-2 AM (which TEFLABS alleged is sold by Plaintiff as Fluo-8H) had [the same] advantages.  AAT Bioquest sells 4 versions of Fluo-8 with different affinities.  There was no evidence that the Fluo-8 versions differ in any aspect other than affinity."  Def.'s PFFCL ¶ 18 at 7.  TEFLABS does not indicate where in Dr. Diwu's affidavits he makes this claim.  The passage of Dr. Diwu's trial testimony that TEFLABS cites in support of its attorney argument actually shows that Fluo-8 and Fluo-8H are different products.   TEFLABS failed to produce any competent evidence—during trial or at any prior point—of noninfringing substitutes.[7]

The parties have stipulated that AAT has satisfied the third *Panduit* factor.  It is undisputed that AAT had the capability to produce, market and sell the Fluo-8 product sold by TEFFLABS between July 2014 and May 2015.

The fourth *Panduit* factor requires the patentee to demonstrate the amount of profit it would have made but for the infringing sales.  The undisputed facts show that TEFLABS sold 1230.3 milligrams of Fluo-8 between July 2014 and May 2015, at a profit of $76,447.50.  It is also undisputed that AAT's costs for manufacturing and selling Fluo-8 are $2.90 per milligram, AAT's market rate for Fluo-8 is $245 per milligram, and AAT offers distributors and potential strategic partners specific discounts.  Based on these facts, AAT calculates its lost profits to be

---

[7]   As part of its pretrial submissions, TEFLABS attempted to introduce exhibits purporting to show noninfringing alternatives to Fluo-8.  The court excluded these exhibits for numerous reasons: first, TEFLABS failed to disclose any noninfringing alternatives until its pretrial submissions, even though TEFLABS had been served with a contention interrogatory that directly requested this information; second, AAT moved in limine to exclude the exhibits and TEFLABS failed to timely oppose AAT's motion; and third, it was not apparent that the products on TEFLABS's list of noninfringing alternatives were even in the same class of products as Fluo-8. *See* Docket No. 78 at 3-5.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   $141,026.23.  This evidence meets AAT's requirement under the fourth *Panduit* factor to

2   demonstrate the amount of profit it would have made.

3        Once the patentee has "show[n] that there was a reasonable probability that the sales would

4   have been made 'but for' the infringement ... e.g., by satisfying the *Panduit* test, it has sustained

5   the burden of proving entitlement to lost profits due to the infringing sales."  *Rite-Hite*, 56 F.3d at

6   1545.  "The burden then shifts to the infringer to show that the inference is unreasonable for some

7   or all of the lost sales."  *Id.*

8        TEFLABS argues that it is unreasonable to believe that AAT could convert all of

9   TEFLABS's sales at almost twice TEFLABS's pricing.[8]  The only "evidence" cited in support of

10  TEFLABS's argument on this point are that (1) AAT did not retain an expert on damages; and (2)

11  TEFLABS's five major customers were distributors, and Dr. Diwu could not identify the desired

12  profit margins for distributors who purchase at a wholesale price.

13       Against TEFLABS's position are ample facts supporting the soundness of AAT's lost

14  profits analysis.  The market demand for Fluo-8 is undisputed.  If TEFLABS had not copied and

15  began selling Fluo-8, the Fluo-8 market would consist of one supplier, namely AAT, with AAT

16  setting the market prices. TEFLABS's sale of infringing product at reduced prices depressed the

17  market prices that AAT normally would have charged.

18       Using historical data for Fluo-8 sales from 2007 to 2014, AAT demonstrated that it had

19  standard rates for different types of customers, including distributors.  AAT established that it

20  would have applied those rates to TEFLABS's customers, had those customers been AAT's.

21       On balance, AAT's evidence is more robust and persuasive, and TEFLABS has failed to

22  meet its burden of showing that AAT's calculation of its lost sales is unreasonable.

23       For the foregoing reasons, the court finds that AAT has met its burden of establishing that

24  there was a reasonable probability that TEFLABS's sales of Fluo-8 would have been made by

25

26  _____

27  [8]  For the sake of the analysis, the court does some simple math based on the facts presented by the
    parties.  TEFLABS earned $76,447.50 in revenue from its sales of 1230.3 milligrams of Fluo-8,
    for an average price of $62.13 per milligram.  AAT estimates its lost profits to be $141,026.23 for

28  the sales of the same 1230.3 milligrams, for an average price of $114.62 per milligram.

AAT but for TEFLABS's infringement.  Accordingly, the court awards AAT damages for

TEFLABS's infringement of the '165 Patent in the form of lost profits, for a total amount of

**$141,026.23**.  Because it awards damages based on lost profits, the court does not reach the issue

of reasonable royalty damages.

### B.      Willfulness

AAT argues that TEFLABS's infringement of the '165 Patent was willful and that AAT

should therefore be awarded enhanced damages.  The court first turns to the question of

willfulness, then enhanced damages.

### 1.      Legal Standards

"[T]he court may increase the damages [for infringement] up to three times the amount

found or assessed."  35 U.S.C. § 284.  "A trial court's discretion in awarding enhanced damages

has a long lineage in patent law."  *In re Seagate Technology, LLC*, 497 F.3d 1360, 1368 (Fed. Cir.

2007).  The Federal Circuit has held that "an award of enhanced damages requires a showing of

willful infringement."  *Id.*  However, "a finding of willfulness does not require an award of

enhanced damages; it merely permits it."  *Id.*

To establish the requisite recklessness for willful infringement, the *Seagate* court

established a "two-pronged analysis entailing separate objective and subjective inquiries."  *Powell*

*v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1236 (Fed. Cir. 2011) (citing *Seagate*, 497 F.3d at

1371).  Under the first prong, "the patentee has the burden of showing 'by clear and convincing

evidence that the infringer acted despite an objectively high likelihood that its actions constituted

infringement of a valid patent.'"  *Stryker Corp. v. Zimmer, Inc.*, 782 F.3d 649, 660 (Fed. Cir.

2015) (citing *Seagate*, 497 F.3d at 1371)), *cert. granted*, 136 S. Ct. 356 (2015).  In other words,

"the 'objective' prong of *Seagate* tends not to be met where an accused infringer relies on a

reasonable defense to a charge of infringement."  *Spine Solutions, Inc. v. Medtronic Sofamor*

*Danek USA, Inc.*, 620 F.3d 1305, 1319 (Fed. Cir. 2010).  *See also Bard Peripheral Vascular, Inc.*

*v. W.L. Gore & Associates, Inc.*, 682 F.3d 1003, 1005 (Fed. Cir. 2012) (the willfulness inquiry

often turns on whether a defense or noninfringement theory was reasonable).  "The state of mind

of the accused infringer is not relevant to this objective inquiry."  *Seagate*, 497 F.3d at 1371.

United States District Court
Northern District of California

Rather, "this objectively-defined risk …[is] determined by the record developed in the infringement proceeding." *Id.* Accord *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. 2014-1492, – F.3d –, 2015 WL 4639309, at *15 (Fed. Cir. Aug. 4, 2015) (determination of objective prong of *Seagate* may be made with reference to record developed during the infringement proceeding, and was not limited to the trial record).Only if the patentee meets this "threshold objective standard" does the inquiry then move on to the subjective second prong, i.e., whether "this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." *Id.* (citing *Seagate*, 497 F.3d at 1371).[9]

### 2.   Analysis

#### a.   Objective Prong of *Seagate*

The court finds that AAT has demonstrated by clear and convincing evidence that TEFLABS acted despite an objectively high likelihood that its actions infringed a valid patent.

To begin with, after the '165 Patent issued and AAT sent the cease and desist letter,

---

[9]   As discussed below, the Supreme Court's holding in *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, – U.S. –, 134 S. Ct. 1749, 1756 (2014) overturned the Federal Circuit's previous standard governing whether a case is "exceptional" under 35 U.S.C. § 285 such as to warrant attorneys' fees.  On October 19, 2015, the Supreme Court granted certiorari for both *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 780 F.3d 1357, 1361 (Fed. Cir. 2015), *cert. granted*, 136 S. Ct. 356 (2015), and *Stryker Corp. v. Zimmer, Inc.*, 782 F.3d 649, 660 (Fed. Cir. 2015), *cert. granted*, 136 S. Ct. 356 (2015), consolidating the cases, to consider the question of whether the Federal Circuit erred by applying the two-part test for enhancing patent infringement damages under 35 U.S.C. § 284, in light of the Supreme Court's rejection of the same two-part test under the similarly-worded 35 U.S.C. § 285 in *Octane Fitness*. 136 S. Ct. 356 (2015).  In her dissent in *Halo*, Judge O'Malley noted that the Federal Circuit's test for exceptional cases under Section 285 is "analogous" to its test for enhanced damages under Section 284, and the jurisprudence on both statutes has been "closely mirrored."  *Halo*, 780 F.3d at 1361 (O'Malley, J., dissenting).  Judge O'Malley urged the Federal Circuit to abandon the *Seagate* enhanced damages analysis in favor of a more flexible approach akin to the *Octane Fitness* analysis for exceptional cases, including by abandoning the requirement that litigants establish their entitlement to enhanced damages by clear and convincing evidence rather than the ordinary preponderance of the evidence standard. However, as it stands today, the Federal Circuit has not abrogated its *Seagate* analysis for enhanced damages.  *See Halo*, 780 F.3d at 1358 (denying petition for rehearing en banc); *Stryker*, 782 F.3d at 660-662 and n. 6 (applying *Seagate* analysis and noting that "[t]his court has not yet addressed whether *Octane Fitness*… altered the standard of review under which this court analyzes the objective prong of willfulness").

United States District Court
Northern District of California

1   TEFLABS knew that it was infringing the patent but nevertheless continued to sell its infringing

2   product.

3         An objective assessment of the case shows that TEFLABS did not present reasonable

4   defenses regarding invalidity or unenforceability of the patent.  As discussed above, on summary

5   judgment, TEFLABS repeatedly failed to present evidence related to the basic legal standards for

6   its defenses.  *See, e.g.,* MSJ Order at 8 ("TEFLABS failed to present any evidence relevant to th[e]

7   legal standard" on its written description defense, including by not addressing or providing

8   evidence regarding the most basic element of such defense, or "what a person of ordinary skill in

9   the art would have understood based on the disclosure within the four corners of the '165 Patent

10  specification or … based on what was well-known in the art"); 20 (TEFLABS's obviousness

11  argument "fail[ed] to cite to any evidence regarding what a person of ordinary skill in the art

12  would have understood at the time of patent filing.  This reason alone is sufficient to deny

13  TEFLABS's motion for summary judgment").

14        Instead, TEFLABS's summary judgment submissions relied heavily on attorney argument

15  rather than record evidence or case law.  As noted by this court, TEFLABS's briefs included

16  "virtually no citations to legal authority, and only minimal citations to undifferentiated masses of

17  [hundreds of pages] of [patent files]."  MSJ Order at 8.  *See also id.* at 21 ("TEFLABS simply

18  asserts that 'Fluo-2 is a lead compound … and is a logical starting point for investigating

19  competitive alternatives to Fluo-4.'  This is conclusory attorney argument with no evidence cited

20  to support it."); 26 ("TEFLABS makes conclusory, scattershot allegations of instances of

21  inequitable conduct supported by a handful of impenetrable evidentiary citations [i.e., mass

22  citations to approximately 1,000 pages of patent files].  These unsupported attorney arguments are

23  insufficient to meet TEFLABS's burden.  Notwithstanding this evidentiary failure, TEFLABS's

24  arguments are still insufficient to the extent they accuse 'AAT Bioquest' or 'Plaintiff' of engaging

25  in inequitable conduct, because they fail to demonstrate the specifics of the inequitable conduct.").

26        In its defense against a finding of willfulness, TEFLABS takes a second bite at the

27  proverbial apple by recapitulating the same attorney arguments about invalidity and

28  unenforceability that it raised during summary judgment.  This misses the point.  In determining

United States District Court
Northern District of California

19

United States District Court
Northern District of California

whether TEFLABS acted willfully, the court does not re-adjudicate the sufficiency of TEFLABS's defenses but instead considers whether those defenses were objectively reasonable.  TEFLABS's failure to offer evidence or persuasive case law in support of its defenses rendered them meritless as presented.

The court finds that TEFLABS's reliance on its counsel's opinions was objectively unreasonable because those opinions bore significant indicia of unreliability.  "[A] competent opinion of counsel concluding … [that a patent is] invalid would provide a sufficient basis for [the defendant] to proceed without engaging in objectively reckless behavior." *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1339 (Fed. Cir. 2008).  "Those cases where willful infringement is found despite the presence of an opinion of counsel generally involve situations where opinion of counsel was either ignored or found to be incompetent." *Read Corp.*, 970 F.2d at 828-29.[10]  This "does not mean a client must itself be able to evaluate the legal competence of its attorney's advice to avoid a finding of willfulness.  The client would not need the attorney's advice at all in that event." *Read Corp.*, 970 F.2d at 829.  Instead, whether "an opinion is 'incompetent' must be shown by objective evidence.  For example, an attorney may not have looked into the necessary facts, and, thus, there would be no foundation for his opinion.  A written opinion may be incompetent on its face by reason of its containing merely conclusory statements without discussion of facts or obviously presenting only a superficial or off-the-cuff analysis." *Id.*

Mr. Yeager's March 3, 2011 response to AAT's notice letter relied entirely on the argument that Fluo-8 was covered by the claims in the Tsien Patent, and that because the Tsien Patent had expired, Fluo-8 was in the public domain.  Yet Mr. Yeager admitted that he did not cite

---

[10]  AAT contends that the fact that TEFLABS did not obtain the advice of *outside* counsel when concluding that Fluo-8 was unpatentable and that the '165 Patent was invalid should weigh in favor of finding willfulness.  However, "there is no affirmative obligation to obtain opinion of counsel." *Seagate*, 497 F.3d at 1371.  This necessarily includes the corollary statement that there is no obligation to obtain opinion of outside counsel, especially where, as here, the TEFLABS employee who reviewed the patent application and subsequent patent was a patent attorney who has been licensed to practice before the PTO for twenty years.  What is significant for the court's analysis of willfulness is not that TEFLABS failed to seek the advice of *outside* counsel, but that it failed to seek *competent* advice of counsel.

United States District Court
Northern District of California

1   any case law and did not examine whether Claim 1 of the '165 was patentable over the genus

2   claim in the Tsien Patent.  After the '165 Patent issued, Mr. Yeager maintained the position that

3   the Tsien Patent anticipated or rendered obvious Claim 1 of the '165 Patent, even after the patent

4   examiner considered the same prior art and found Claim 1 patentable over it.  This is significant

5   because, "[a] patent is presumed valid," 35 U.S.C. § 282; the party challenging validity must meet

6   the "high burden" of proving invalidity by "clear and convincing evidence," *Sciele Pharma Inc. v.*

7   *Lupin Ltd.*, 684 F.3d 1253, 1260 (Fed. Cir. 2012); and the burden is especially high when the party

8   challenging validity relies on the same evidence that was before the patent examiner, *see Tokai*

9   *Corp. v. Easton Enterprises, Inc.*, 632 F.3d 1358, 1367 (Fed. Cir. 2011).

10       Mr. Yeager was not alone in his dogged but objectively unsupported belief in the invalidity

11   of AAT's patent.  At trial, Dr. Minta testified that nothing could have happened in the patent

12   prosecution that would have convinced TEFLABS that Claim 1 of the '165 Patent should have

13   issued.

14       Lastly, TEFLABS made numerous sales of the infringing product even after this court

15   granted summary judgment on the validity and enforceability of the '165 Patent and entered a

16   permanent injunction enjoining TEFLABS from selling Fluo-8.  This alone constitutes clear and

17   convincing evidence that TEFLABS acted despite an objectively high likelihood that its actions

18   constituted infringement of a valid patent.

19       **b.  Subjective Prong of *Seagate***

20       The court finds that AAT has easily met the second prong of the *Seagate* test.  This

21   analysis asks whether the objectively-defined risk of infringement was either known or so obvious

22   that it should have been known to TEFLABS.  With respect to TEFLABS's sales of Fluo-8 after

23   the issuance of the '165 Patent and prior to the permanent injunction, TEFLABS admits that it

24   knew these sales infringed the patent but continued selling Fluo-8 without attempting to design

25   around the patent.  As to TEFLABS's sales of Fluo-8 after the permanent injunction, TEFLABS

26   should have attended to the obvious risk that TEFLABS employees would continue to sell Fluo-8

27   if they were not clearly informed of the injunction.  Dr. Minta's  remorse about the post-injunction

28   sales is not sufficient to absolve TEFLABS of its responsibility to take reasonable measures to

1   implement a direct court order; its continued sales cannot be excused, even if they were the result

2   of reckless miscommunication rather than intentional malfeasance.

3          For the reasons stated above, the court finds that AAT has met its burden of showing by

4   clear and convincing evidence that TEFLABS acted despite an objectively high likelihood that its

5   actions constituted infringement of a valid patent, and that TEFLABS knew or should have known

6   about the risk of infringement, such that its infringement of the '165 Patent was willful.

7          **C.      Enhanced Damages**

8          Having determined that TEFLABS's infringement was willful, the court now turns to the

9   separate question of whether damages should be enhanced.  *See i4i Ltd. P'ship v. Microsoft Corp.*,

10  598 F.3d 831, 859 (Fed. Cir. 2010), *aff'd*, 31 S. Ct. 2238 (2011) ("[T]he test for willfulness is

11  distinct and separate from the factors guiding a district court's discretion regarding enhanced

12  damages.").

13                 **1.      Legal Standards**

14         As noted above, a finding of willful infringement is required for, but does not mandate

15  enhancement of damages.  *Seagate*, 497 F.3d at 1368.  *See also Robert Bosch, LLC v. Pylon Mfg.*

16  *Corp.*, 719 F.3d 1305, 1327 (Fed. Cir. 2013) (Reyna, J., concurring in part and dissenting in part)

17  ("*Seagate* was careful to distinguish between the determination that infringement was willful and

18  the decision of whether damages should be enhanced.").  In order to determine whether enhanced

19  damages are appropriate, a court must "evaluate willfulness and its duty of due care under the

20  totality of the circumstances." *Seagate*, 497 F.3d at 1369.  *See also Read Corp. v. Portec, Inc.*,

21  970 F.2d 816, 826 (Fed. Cir. 1992) ("The paramount determination in deciding to grant

22  enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all

23  the facts and circumstances.").

24         The Federal Circuit has enumerated factors informing this inquiry ("the *Read* factors):

25  "(1) whether the infringer deliberately copied the ideas or design of another; (2) whether the

26  infringer, when he knew of the other's patent, investigated the patent and formed a good faith

27  belief that it was invalid or that it was not infringed; (3) the infringer's behavior in the litigation;

28  (4) the infringer's size and financial condition; (5) the closeness of the case; (6) the duration of the

United States District Court
Northern District of California

22

1  misconduct; (7) the remedial action by the infringer; (8) the infringer's motivation for harm; and

2  (9) whether the infringer attempted to conceal its misconduct." *Robert Bosch*, 719 F.3d at 1327

3  (Reyna, J., concurring in part and dissenting in part) (citing *Read Corp.*, 970 F.2d at 826-27; *i4i*,

4  598 F.3d at 858-59). "The above factors taken together assist the trial court in evaluating the

5  degree of the infringer's culpability and in determining whether to exercise its discretion to award

6  enhanced damages and how much the damages should be increased." *Read Corp*, 970 F.2d at

7  828.

8                    2.        **Analysis**

9           All but one of the *Read* factors weigh in favor of enhanced damages. For this reason, the

10  court finds that an award of enhanced damages is warranted.

11          As to the first factor, it is undisputed that TEFLABS deliberately copied Fluo-8, knowing

12  it was an AAT product.

13          The second factor also weighs in favor of enhanced damages. The court has already

14  discussed TEFLABS's doggedly blind confidence in its legal position. TEFLABS's misguided

15  belief that the '165 Patent was invalid (or that the patent would not issue) was based on a sparse

16  review by its owner/patent counsel that failed to examine whether Claim 1 would be patentable

17  over the genus claim of the Tsien Patent. Much of TEFLABS's invalidity argument rested on

18  the weak position that the Tsien Patent anticipated or rendered obvious Claim 1 of the '165

19  Patent, even though the patent examiner had considered the Tsien Patent and found Claim 1

20  patentable over it.

21          The third factor, TEFLABS's behavior in litigation, is a mixed bag that ultimately weighs

22  in favor of enhanced damages. TEFLABS's litigation behavior was problematic. It made

23  misrepresentations regarding its document preservation and document collection, and also

24  routinely missed deadlines. This is regrettable conduct and the court does not condone it, but the

25  court gives TEFLABS's counsel some leeway in acting as both attorney and client in a case for

26  which he was not compensated. Also mitigating against TEFLABS's poor behavior in litigation

27  is the fact that AAT has not identified how it was prejudiced by it. With respect to TEFLABS's

28  settlement positions, they were unrealistic but not outlandish, particularly when viewed in

United States District Court
Northern District of California

23

United States District Court
Northern District of California

comparison to the aggressive settlement positions often staked out in patent cases.  However, TEFLABS's post-injunction behavior tilts this factor toward enhanced damages.  TEFLABS continued to make infringing sales of Fluo-8 even after the court ordered a permanent injunction. Although the total amount of post-injunction sales was modest, TEFLABS's flippant conduct and lack of accountability exhibited disregard for the judicial process and for AAT's legally established rights.

The fifth *Read* factor also supports an enhanced damage award.  The case was not close on the merits.  This was due to TEFLABS' weak presentation of its defenses at summary judgment, set forth above.

The sixth factor examines the duration of the misconduct.  Here, TEFLABS sold its infringing product from before the issuance of the patent in July 2014 until May 27, 2015, which was several weeks after entry of the permanent injunction.

Factors seven and eight also point toward an award of enhanced damages. TEFLABS did not take remedial action to address the infringement.  For example, it did not attempt a design-around once it learned of the issuance of the patent.  The evidence also supports a finding that TEFLABS was motivated to harm AAT.  TEFLABS did not cease selling Fluo-8 in part because it wanted the revenue.  It took deliberate steps to woo AAT customers by offering them a lower price for its infringing product.  TEFLABS also was motivated to continue its infringing sales because it wanted to make itself more attractive to one of AAT's customers, Molecular Devices, as a potential acquisition.[11]

The ninth *Read* factor, which examines whether the infringer attempted to conceal its misconduct, weighs moderately in favor of enhanced damages.  TEFLABS surreptitiously acquired Fluo-8 from another source and analyzed it, because it knew that AAT would not sell to TEFLABS.  However, these acts predated the issuance of the patent.  Once the patent was issued,

---

[11] "Where … the infringer engages in infringing conduct to gain an edge over the patentee in a competitive market, this factor favors an award of enhanced damages." *Funai Elec. Co., Ltd. v. Daewoo Elec. Corp.*, 593 F.2d 1088, 1116-17 (N.D. Cal. 2009).

TEFLABS made no efforts to conceal that it was selling the same Fluo-8 product that AAT offered.

The only *Read* factor that weighs against an enhanced damage award is the fourth one, which examines the infringer's size and financial condition.  TEFLABS is a small company consisting of five employees, with revenue of $400,000 in 2014.  The evidence establishes that one of the reasons TEFLABS did not seek the advice of outside counsel is because it could not afford to do so.

Considering all of the factors discussed above, the court finds that an award of enhanced damages is warranted in this case.  The court therefore **grants** AAT treble damages for TEFLABS's infringement of the '165 Patent, or **$423,078.69**.

**D.    Exceptional Case**

AAT contends that this case is "exceptional," such that the court should award attorneys' fees.

**1.    Legal Standards**

Under 35 U.S.C. § 285, a "court in exceptional cases may award reasonable attorney[s'] fees to the prevailing party."  The Supreme Court recently held that "[a]n 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, – U.S. –, 134 S. Ct. 1749, 1756 (2014).

In reaching this holding, the Supreme Court abrogated the previous standard for exceptional cases set forth in the Federal Circuit's decision in *Brooks Furniture Manufacturing, Inc. v. Dutailier International, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005).  Under the *Brooks Furniture* standard, a case was "exceptional" only "if a district court either finds litigation-related misconduct of an independently sanctionable magnitude or determines that the litigation was both 'brought in subjective bad faith' and 'objectively baseless.'"  *Octane Fitness*, 134 S.Ct. at 1756 (citing *Brooks Furniture*, 393 F.3d at 1381).  The Supreme Court rejected this formulation as "overly rigid" because it "superimposes an inflexible framework onto statutory text that is

United States District Court
Northern District of California

United States District Court
Northern District of California

1  inherently flexible," and also found it "so demanding that it would appear to render § 285 largely

2  superfluous." *Id.* at 1756, 1758.  The Supreme Court also rejected *Brooks Furniture*'s

3  requirement that patent litigants establish their entitlement to attorneys' fees by clear and

4  convincing evidence, and found instead that the preponderance of the evidence standard applied.

5  *Id.* at 1758.

6        Under the lower standard in *Octane Fitness*, "[d]istrict courts may determine whether a

7  case is 'exceptional' in the case-by-case exercise of their discretion, considering the totality of the

8  circumstances." *Id.*  "[T]here is no precise rule or formula for making these determinations, but

9  instead equitable discretion should be exercised in light of the considerations we have identified."

10 *Id.* n.6 (identifying a "nonexclusive" list of considerations imported from copyright context,

11 including "frivolousness, motivation, objective unreasonableness (both in the factual and legal

12 components of the case) and the need in particular circumstances to advance considerations of

13 compensation and deterrence").

14        "While a finding of willful infringement does not require a finding that a case is

15 exceptional, … willfulness of the infringement by the accused infringer may be a sufficient basis

16 in a particular case for finding the case 'exceptional' for purposes of awarding attorney fees to the

17 prevailing patent owner." *Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1340 (Fed. Cir.

18 2004) (citation and formatting omitted).  "Based on a finding of willful infringement, it is within

19 the district court's discretion whether to award attorney fees under § 285." *Id.*  However,

20 "[a]lthough an attorney fee award is not mandatory when willful infringement has been found,

21 precedent establishes that the court should explain its decision not to award attorney fees."

22 *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1349 (Fed. Cir. 2011) (citing *Transclean Corp.*

23 *v. Bridgewood Servs., Inc.,* 290 F.3d 1364, 1379 (Fed. Cir. 2002) ("[T]he general rule [is] that the

24 district court must normally explain why it decides that a case is not exceptional under 35 U.S.C. §

25 285 when a factual finding of willful infringement has been established and, if exceptional, why it

26 decides not to award attorney fees.").

27        An exceptional case is "rare."  *Octane Fitness*, 134 S.Ct. at 1756.  The sanctions imposed

28 under Section 285 "carry serious economic and reputational consequences for both litigants and

1    counsel." *iLOR, LLC v. Google, Inc.*, 631 F.3d 1372, 1376 (Fed. Cir. 2011).

2                    **2.**    **Analysis**

3         AAT's argument for why this case is exceptional rests on the same facts as its arguments

4    on willfulness and enhanced damages, i.e., the weakness of TEFLABS's defenses, TEFLABS's

5    motivation behind copying AAT's product, and the unreasonable manner in which TEFLABS

6    litigated the case.  The court has discussed the evidence on each of these facts at length above, and

7    has granted AAT treble damages because of TEFLABS's conduct.  This body of evidence also

8    supports a finding that two aspects of this case are exceptional.  Specifically, it was objectively

9    unreasonable for TEFLABS to present its defenses in the manner that it did, i.e., by failing to cite

10   law in support of its arguments, and failing to raise evidence on the basic elements of its defenses.

11   This case also stands out from others because TEFLABS continued to sell a modest amount of its

12   infringing product (worth slightly over $2000) even after the court permanently enjoined it from

13   doing so.[12]

14        A determination that portions of this case are exceptional does not automatically mean that

15   AAT is entitled to attorneys' fees.  "[T]he decision whether or not to award fees is … committed

16   to the discretion of the trial judge, and even an exceptional case does not require in all

17   circumstances the award of attorney fees."  *Modine Mfg. Co. v. Allen Grp., Inc.*, 917 F.2d 538, 543

18   (Fed. Cir. 1990).  In determining whether to award attorneys' fees, the trial judge may consider

19   "any … factors that may contribute to a fair allocation of the burdens of litigation as between

20   winner and loser," *S.C. Johnson & Son, Inc. v. Carter–Wallace, Inc.*, 781 F.2d 198, 201 (Fed. Cir.

21   1986), including "the need in particular circumstances to advance considerations of compensation

22   and deterrence." *Octane Fitness*, 134 S.Ct. at 1758 n.6.

23        Here, TEFLABS's unsupported belief in the strength of its arguments was unreasonable in

24   light of its failure to present evidence supporting its positions, as well as its counsel's sparse

25   review of the matter.  TEFLABS's decision to rely on its owner/counsel to supply objective legal

26

27   ───────────────
     [12]  Other conduct by TEFLABS does not warrant a finding of an exceptional case.  Namely, for
28   the reasons stated above, TEFLABS's conduct during litigation was inadvisable but not
     exceptional, as was TEFLABS's motivation to capture some of the market share of Fluo-8.

United States District Court
Northern District of California

1   advice was foolhardy at best.  But TEFLABS also presented evidence that it could not afford to

2   hire counsel in addition to Mr. Yeager.  TEFLABS is a small company and the scale of its

3   infringement was likewise small: it sold 1230.3 milligrams of Fluo-8 over eleven months for

4   which it made $76,447.50.  AAT made hundreds of thousands of dollars in revenue from its sales

5   of Fluo-8 in the same time period.  This is not to trivialize the harm done to AAT by TEFLABS.

6   Dr. Diwu testified convincingly about the stress and expense that he and his company faced as a

7   result of TEFLABS's actions.  However, the court's award of trebled lost profits damages to AAT

8   means that TEFLABS will surrender to AAT an amount that is more than five times the actual

9   revenue it made from its sales of Fluo-8, and roughly equivalent to AAT's 2014 total revenue.

10  This is sufficient compensation, punishment, and deterrence.   After considering the totality of the

11  circumstances, the court will exercise its discretion and decline to award attorneys' fees under 35

12  U.S.C. § 285 for the two aspects of the case that it finds to be exceptional.

### IV.    CONCLUSION

14          The court awards AAT enhanced damages in the form of three times the amount of AAT's

15  lost profits, for a total **$423,078.69**, plus interest and costs.  The court finds that although some

16  portions of this case are exceptional, attorneys' fees are not warranted for those portions.  **By**

17  **December 11, 2015,** the parties shall meet and confer and file a proposed briefing schedule on the

18  sole remaining issues of interest and costs.

19          **IT IS SO ORDERED.**

20  Dated: November 30, 2015

                                                                                                    
                                                                _____
22                                                                          Donna M. Ryu
                                                                    United States Magistrate Judge